THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLEVESTER GARNER, Defendant-Appellant.

First District (1st Division)   No. 1—90—2278

Opinion filed June 21, 1993.

Rita A. Fry, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Christopher Daddino, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

On August 25, 1989, the body of William Winston was found stabbed to death in the kitchen of his house at 2846 West Taylor Street in Chicago. Acting on a tip, police arrested defendant, Clevester Garner, as he was driving the victim's missing automobile. At the conclusion of the ensuing trial, a jury convicted defendant of murder and armed robbery, and the State sought the death penalty. Defendant waived his right to a jury for the subsequent sentence hearing, and the circuit court ultimately found him eligible for the death penalty. However, noting several mitigating factors, the court declined to impose the sentence of death and ordered defendant imprisoned for the rest of his life without the possibility of parole. Defendant also received a 60-year term for the armed robbery, with the sentences to run concurrently. This timely appeal followed.

We affirm.

Police discovered Winston's body on August 25, 1989. No money was found either on the victim or on the premises. The right pocket of Winston's trousers, however, had been turned "inside out." An autopsy revealed that Winston had been stabbed 27 times, primarily in the chest, back, and scalp, and had been dead for about two days.

The State's principal witness was defendant's sister, Delores Garner. At trial, Delores stated that she had met Winston through her friend, Ella Langford, with whom Delores lived at the time. Delores swore that she spent the night of August 23, 1989, with Lucius Smith and did not return to Langford's house until 1 p.m. the next day. Delores maintained that she knew nothing about Winston's death.

Delores, however, admitted that, on August 26, 1989, she told detectives investigating Winston's death that she and Winston had been dating for several months prior to his death and that Winston often gave her money in return for sex. Delores admitted that she further told detectives that she went to Winston's house with defendant and a woman named "Brenda" on August 23, 1989 at 7 p.m. Brenda performed a "sex show" for which she received some money from Winston. Winston put the remainder of his money in his pants pocket. Brenda then left. Winston asked Delores for sex, but she refused. Delores told police that, at that time, defendant "got up into" Winston's face and said, "I thought you were going to help me get on my feet." Winston and defendant argued and went into the kitchen. Delores saw defendant "come up with" a knife and stab Winston in the chest several times. Delores became frightened and fled.

Delores also told detectives that she returned to Winston's home two days later with two friends. Delores climbed through a front window, which she had unlatched on the night of the murder. The house was "disturbed," and Delores took some change and ran away.

Delores also admitted that she met Assistant State's Attorney Michelle Katz at the police station on August 27, 1989, and informed Katz that Winston had told her that he would help defendant by giving him money. Delores told Katz that she related Winston's offer to defendant and that defendant accompanied her and Brenda to Winston's home in order to get some money from Winston. Defendant and Winston fought at the house because defendant wanted money and because Winston had called Ella Langford a "bitch." During her testimony, Delores identified a signed summary of her conversation with Katz, which was later introduced into evidence. Delores further admitted testifying to the same facts before a grand jury on August 28, 1989.

During cross-examination, Delores confessed that she smokes marijuana and takes heroin. In December 1989, she was hospitalized for opiate withdrawal syndrome. Delores denied ever having sex with Winston. She maintained that Winston gave her money when she asked for it. Delores stated that she originally told detectives that she knew nothing about Winston's death, but they elbowed her, slapped her, and yelled at her. When she finally gave a statement, she was treated better and given food. Delores was kept in police custody until she testified before the grand jury and was threatened that if she did not testify to the truth she would be charged with murder.

On redirect examination, Delores conceded that she never told the assistant State's Attorney about the mistreatment she claimed to have suffered at the hands of the police. Delores stated that she loved her brother and would say anything to help him. When asked by defense counsel if she would say anything to save herself, Delores replied that she had "no reason" to save herself.

Mary Jamison testified that she, Barbara Thomas, and Delores met on August 25, 1989, in order to celebrate Mary's birthday. The three women went to a liquor store where Delores made a telephone call. When she returned, Delores stated that "her friend" had told her to "come up and pick up $40." The group then walked to Winston's house on Taylor Street. Delores told them that the "guy" was supposed to give her $40. When they reached the front porch, Delores neither knocked on the door nor rang the doorbell, but, instead, climbed through a window. At that time, Jamison and Thomas left the premises. As they started to leave, Delores ran up behind them with

change "falling from her clothes." When Jamison asked Delores why she was running, Delores replied, "when you do the devil's work, this is what will happen to you." The group returned to Jamison's apartment, where they stayed all night. Delores eventually spent the night at Jamison's mother's apartment, next door to Jamison's apartment. Neither defendant nor defendant's brother, Marvin Williams, was at Jamison's apartment on August 26, 1989.

Marvin Williams testified that, on August 25, 1989, he met defendant while Williams was going to pick up his paycheck. Defendant, who was standing next to a white car, asked Williams if he wanted a lift. When Williams asked where defendant had gotten the car, defendant replied, "don't worry about that, that's my friend's uncle's car." Defendant took Williams to get the check and later dropped him off at a friend's home. Williams identified a photograph of the car in which defendant rode as belonging to Winston.

On August 26, 1989, Williams was at Jamison's mother's apartment when he was told that his sister was in jail for killing a man. Williams went into the hallway, where he saw defendant, and asked him what was going on. Defendant told Williams that Delores "was supposed to have stabbed this guy." She "couldn't finish so he [defendant] finished it." Marvin denied that he was using "PCP" on that date.

Ella Langford testified that she had known Winston for 12 years and that Delores lived at Langford's home at the time of the murder. Winston and Delores were seeing each other, and Winston sometimes gave Delores money because "they were going together." On August 23, 1989, Delores left the house at 8:30 p.m. and did not return until 11:30 the next morning. Lucius Smith repeatedly stopped by the Langford house on the night of the 23rd, looking for Delores. On August 25, 1989, Langford learned that Winston had been stabbed. Following a conversation with Marvin Williams, Langford called police and told them that defendant was in a car "by the projects."

Langford stated that Delores has a reputation as a liar and a violent person in the community. Three weeks prior to the murder, Delores had attempted to stab Langford's son. Marvin Williams also had a reputation as a liar.

On August 26, 1989, Detective James Capesius received a call that Winston's car was spotted at 13th Street and Talman Avenue. During his surveillance of the car, Capesius observed defendant walk to the car, get in, and drive away. Capesius followed and eventually pulled defendant over. Defendant possessed the keys to the car, which was identified as belonging to Winston.

Following closing arguments, the jury returned guilty verdicts as indicated above. The circuit court denied defendant's post-trial motion and subsequently entered the sentence as previously detailed.

Defendant initially contends that Delores was an accomplice witness and that the circuit court committed reversible error by refusing to give the jury the following "accomplice witness" instruction:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 3.17).

A defendant is entitled to the accomplice-witness instruction if there is probable cause to believe the witness was guilty as a principal or as an accessory on the theory of accountability. (*People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234, *cert. denied* (1991), 502 U.S. 829, 116 L. Ed. 2d 189, 112 S. Ct. 233; *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31; *People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772.) An accomplice is not one who merely " 'has guilty knowledge or *** who was even an admitted participant in a related but distinct offense.' " (*People v. Robinson*, 59 Ill. 2d at 191, quoting *People v. Hrdlicka* (1931), 344 Ill. 211, 222, 176 N.E. 308.) An accomplice is one who takes some part, performs some act or owes some duty to the person in danger that makes it incumbent on him or her to prevent the commission of the crime. (*People v. Robinson*, 59 Ill. 2d at 191.) The accomplice-witness instruction should be given to a jury if the totality of the evidence and the reasonable inferences that can be drawn from it establish probable cause to believe, not merely that the person was present and failed to disapprove of the crime, but that he or she participated in the planning or commission of the crime. (*People v. Henderson*, 142 Ill. 2d at 315.) If this test is met, the defendant is entitled to the instruction notwithstanding the witness' denial of involvement. *People v. Cobb*, 97 Ill. 2d at 476; *People v. Howard* (1991), 209 Ill. App. 3d 159, 568 N.E.2d 56, *appeal denied* (1991), 141 Ill. 2d 551, 580 N.E.2d 125.

■ We need not determine whether Delores was an accomplice so as to warrant the giving of the instruction because we are of the opinion that any error which may have occurred from the failure to give the instruction was harmless. Our courts have considered such an error harmless where the general instructions, taken as a whole, correctly and fully instruct the jury. *People v. Parks* (1976), 65 Ill. 2d 132, 138, 357 N.E.2d 487; *People v. Dowd* (1981), 101 Ill. App. 3d

830, 428 N.E.2d 894. See also *People v. Howard*, 209 Ill. App. 3d at 185.

During her testimony, Delores admitted to prior inconsistent statements under oath and to the use of narcotics. Defense counsel sharply cross-examined her as to her motives in testifying, including the possibility of being charged in the present case. Although defendant correctly notes that the jury was not specifically instructed that Delores' credibility was subject to suspicion due to her role as an accomplice, the jury was instructed as to its duty to evaluate the believability of witnesses generally:

> "You are the sole judges of the believability of the witnesses and of he [*sic*] weight to be given to the testimony of each of them. In considering the testimony of any witness you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have and the reasonableness of his testimony considered in the light of all the evidence in the case."

This instruction, though general, has been held to be sufficient in instructing the jury as to an accomplice's credibility in the absence of the more particularly worded accomplice-witness instruction. (See *People v. Dowd*, 101 Ill. App. 3d at 845.) Our conclusion is further strengthened by the fact that the jury also received instructions pertaining to witness believability with regard to drug usage and prior inconsistent statements. Specifically, the jury was instructed that

> "[t]he believability of a witness may be challenged by evidence that on some former occasion he or she made a statement that was not consistent with his or her testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given to the testimony you heard from the witness in this courtroom.
>
> * * *
>
> You have before you evidence that Delores Garner and Marvin Williams were users of narcotics. It is for you to determine whether any witness is addicted to narcotic drugs. If you find from your consideration of all the evidence that a witness is addicted to narcotics, you must subject his or her testimony to full scrutiny and act upon it with great caution."

Both of these instructions related to Delores, and both signalled to the jury that the weight to be given Delores' testimony called for careful scrutiny and caution. Viewing defendant's trial as a whole, we cannot say that the circuit court's refusal to give the instruction de-

prived the jury of intrinsic direction in its evaluation of witness credibility.

■ Defendant next alleges that he was denied a fair trial as a result of improper jury instructions regarding his statement to Marvin Williams. The instruction, IPI Criminal 2d No. 3.06-3.07, concerns statements made by defendant:

> "You have before you evidence that the defendant made a statement relating to the offense charged in the indictment. It is for you to determine [whether the defendant made the statement, and if so,] what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all the circumstances under which it was made." (IPI Criminal 2d No. 3.06-3.07.)

The instruction given to the jury in the present case omitted the bracketed phrase. The committee notes following the instruction state that the phrase directing the jury to determine whether defendant made the statement should be deleted only when the defendant admits to making the material statement attributed to him. IPI Criminal 2d No. 3.06-3.07, Committee Note.

Defendant cites *People v. Cook* (1965), 33 Ill. 2d 363, 211 N.E.2d 374, in support of his argument for reversal because of the failure to tender the omitted phrase. However, that case is factually distinguishable from the facts of the present case. In *People v. Cook*, the defendant testified at trial and denied taking part in the robbery at issue. Furthermore, the defendant denied admitting his guilt to the police and stated that he refused to sign the written statement in which he confessed to his participation in the crime. (*People v. Cook*, 33 Ill. 2d at 367-68.) Here, defendant did not take the stand at trial to specifically deny making the statement to his brother, nor was there any other evidence presented to the jury which raised the question of whether he made the statement. Thus, the main distinction between defendant's situation and that in *People v. Cook* was that the jury here was not aware of the possibility that defendant denied making the statement ascribed to him. At trial, defendant neither admitted nor denied anything. Accordingly, the facts of the present case are more similar to those in *People v. Lee* (1986), 151 Ill. App. 3d 510, 502 N.E.2d 399, and *People v. Fleming* (1981), 103 Ill. App. 3d 194, 431 N.E.2d 16, where the reviewing courts held that the failure to include the bracketed language did not warrant reversal where defendant presented no evidence that defendant denied making the statement. To allow otherwise would confuse the jury by making it decide an issue improperly before it. (*People v. Lee*, 151 Ill. App. 3d at 530;

*People v. Fleming,* 103 Ill. App. 3d at 198.) Moreover, as noted above, the jury here was instructed on weighing the testimony in general and witness credibility. (See *People v. Lee,* 151 Ill. App. 3d at 530.) Accordingly, we are satisfied that, given the lack of evidence presented to the jury which would indicate that defendant denied making the statement, the instruction was sufficient without the deleted phrase.

Defendant next contends that certain remarks made by the prosecutor in closing argument operated to deny him a fair trial. Defendant specifically points to the prosecutor's remarks concerning Delores and the reason why she was not charged in this case.

This issue has been waived due to defendant's failure to make a contemporaneous objection at trial and his failure to include the claim in his post-trial motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274; *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Center* (1990), 198 Ill. App. 3d 1025, 556 N.E.2d 724.) Moreover, the waiver cannot be excused under the plain error exception because neither prong of that exception (see 134 Ill. 2d R. 615(a)) is satisfied in this case.

Were we to reach the merits of defendant's argument, the complained-of comments, even if improper, are not grounds for setting aside the conviction because it cannot be said that they constituted a material factor in the determination reached by the jury. See *People v. Dowd,* 101 Ill. App. 3d at 847.

Finally, defendant argues that his armed robbery conviction must be reversed because the State presented insufficient evidence to sustain the charge.

A conviction of armed robbery requires proof that the accused committed a robbery while carrying, or armed with, a dangerous weapon. (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a).) The offense of robbery is committed when force or the threat of force is used in the taking of property from the person or the presence of another. (Ill. Rev. Stat. 1989, ch. 38, par. 18—1(a).) That the taking was by use or threat of force is proven where the fear of the victim was of such a nature so as to induce a reasonable person to part with his property for the sake of his person. (*People v. Thomas* (1989), 189 Ill. App. 3d 365, 545 N.E.2d 289.) Therefore, it is the utilization of force or intimidation in the taking which is the material element of the offense. (*People v. Downey* (1987), 162 Ill. App. 3d 322, 515 N.E.2d 362, *appeal denied* (1988), 119 Ill. 2d 563, 522 N.E.2d 1249.) Whether or not such force or threats of force were used is a question of fact for the

jury to decide, and its decision will not be disturbed on appeal unless the evidence is so improbable or unsatisfactory as to leave a reasonable doubt of guilt. *People v. Thomas*, 189 Ill. App. 3d at 369.

Defendant contends that the prosecution failed to establish that the property was taken by the use of force or the threat of force. Relying on *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121, defendant states that his use of force was not employed for the purpose of causing Winston to relinquish his property.

■■ The defendant in *People v. Tiller* was convicted of murder on an accountability theory and of armed robbery for taking the murder victim's vehicle. The defendant in that case left the scene before the murder was committed by a codefendant, but later returned to take the victim's vehicle, which was parked nearby. The supreme court reversed the defendant's armed robbery conviction because there was no connection between the force exerted against the victim and the eventual taking of the vehicle. (*People v. Tiller*, 94 Ill. 2d at 316.) The taking of the vehicle in *People v. Tiller* was apparently an afterthought to the commission of the murder. In the present case, the evidence shows that defendant went to Winston's house with the express purpose of getting some money from Winston. Once there, the two men began to argue over money, ending ultimately with defendant picking up a knife and stabbing Winston with it. Delores' testimony established that, while alive, Winston carried cash in his trouser pocket. This pocket was found turned "inside out" and empty by police. Under these circumstances, the jury could properly conclude that defendant's use of force and removal of the property were essentially a related series of acts. This conduct establishes the necessary concurrence of events to constitute armed robbery. See *People v. Williams* (1987), 118 Ill. 2d 407, 515 N.E.2d 1230.

In view of the foregoing, defendant's convictions must be affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.