THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID
BIRO, Defendant-Appellant.

First District (5th Division) No. 1—92—0169

Opinion filed March 31, 1994.

Gevirtz, Born & Kissel, of Northbrook, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant David Biro (Biro) was found guilty of the April 7, 1990, murders of Stephen and Nancy Langert in Winnetka, Illinois. In addition, he was found guilty of intentional homicide of an unborn child, home invasion and burglary. Biro, who was just 16 years old at the time the crimes were committed, was tried as an adult and sentenced to natural life in prison. He now appeals his conviction and sentence, requesting a new trial on the basis of certain alleged evidentiary errors or, in the alternative, a new sentencing hearing. For reasons that follow, we affirm Biro's convictions, but remand for further sentencing.

On the night of April 7, 1990, Nancy Langert, who was three months pregnant, and her husband Stephen were murdered in their Winnetka townhouse. The contested issue at Biro's trial was whether the evidence indicated that it was Biro who committed these murders, and in the course of doing so, committed the additional crimes of home invasion, burglary and intentional homicide of an unborn child. On appeal, Biro does not challenge the fact that there was sufficient evidence that he committed the crimes. He argues instead that he was denied a fair trial due to the admission of certain evidence which he feels was more prejudicial than probative. He also assigns error to

the court's ruling to disallow certain evidence. Specifically, the issues brought before this court by Biro are: (1) whether he was unfairly prejudiced by the admission of evidence of other crimes or bad acts, (2) whether he was unfairly prejudiced by the State's cross-examination of him and his father regarding a lack of parental supervision, (3) whether his constitutional right to remain silent was impugned by references and comments made by the prosecutor during closing argument, (4) whether the trial court allowed unfounded, hearsay rebuttal evidence to be admitted, (5) whether the trial court erred by refusing to allow Biro's counsel to solicit testimony concerning the course and scope of the police investigation into the Langert murders, which went far afield before focusing on Biro, (6) whether the trial court erred by admitting photographic exhibit No. 84 into evidence, and (7) whether it was unconstitutional to impose a mandatory natural life sentence on a minor who had not had the benefit of a transfer hearing pursuant to the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1990, ch. 37, par. 801—1 *et seq.*).

Before addressing these issues, we shall briefly recount the facts of this case.

On April 7, 1990, Stephen and Nancy Langert went to dinner in Chicago with Nancy's parents, Lee and Joyce Bishop. After dinner, between 10:15 and 10:30 p.m., the Langerts drove the Bishops to their Winnetka home and then proceeded to their townhouse located at 722 Oak Street in Winnetka. This was the last time the Langerts were seen alive. The next day Mr. Bishop found the Langerts' dead bodies in the basement of the townhouse. Stephen had been shot once, in the back of the head, and Nancy had been shot twice, in the chest and in the abdominal region.

Mr. Bishop summoned the police, triggering an intensive police investigation into the murder of Stephen and Nancy Langert. As a result of their investigation, the police learned that a neighbor, Lorraine Rosenberg, whose townhouse shared a common wall with the Langert townhouse, heard a loud noise shortly after 10:30 p.m. on the night of April 7, 1990. Also, at the scene of the crime, the police discovered: that the glass from a sliding glass door at the rear of the Langert townhouse had been cut and the pieces of glass stacked neatly on a welcome mat; that Nancy Langert's purse had been emptied in the middle of the townhouse living room, but that a large amount of cash was left untouched; a spent bullet found on the floor near the door to the basement; a pair of handcuffs found on Stephen Langert's wrist; a single black glove found behind the townhouse; and an overturned metal shelving unit in the basement of the townhouse, which contained what appeared to be some writing in blood.

The intensive police investigation, which continued for two months, generated well over 900 pages of reports. Yet, despite all of the police efforts, they were no closer to finding the Langerts' killer. Then, on October 4, 1990, two New Trier High School students walked into the Winnetka police station and spoke to police sergeant Patricia McConnell. One of those students, Phu Hoang (Phu), revealed that a friend of his, another New Trier student by the name of David Biro, had confessed to him that he had committed the Langert murders. Based upon information from Phu, Biro was arrested and search warrants for David Biro's bedroom were obtained. Executing the warrants, the police recovered a number of articles which circumstantially connected Biro to the murders, including a glass cutter, several pairs of handcuffs, and a Waltham .38-caliber handgun.

At trial, Phu was the State's key witness. He testified that in July of 1990 Biro confessed to him that he murdered the Langerts. In subsequent conversations Biro provided Phu with a number of details regarding the killings which correlated to the actual crime. Although Phu's testimony, alone, was sufficiently damaging, the State was also able to show that the gun found in Biro's room had been stolen by Biro just prior to the murders and that weapons testing revealed that it was the murder weapon. In addition, the State was able to show that, at 9 p.m. on the night the murders took place, Biro had been seen in the vicinity of the Langert townhouse, that the glove found at the scene contained traces of secretions which were consistent with Biro's blood type, and that Biro had in his possession a glass cutter and handcuffs of the same brand found on Stephen Langert.

Biro testified in his own defense, denying that he committed the murders. He admitted stealing the gun and even admitted that it was the gun used in the murders. He claimed, however, that he had given the gun to a friend, Burke Abrams, to sell and that Abrams committed the murders using the gun. Biro further testified that Abrams returned the gun to him at his home at 11 p.m. on the night of April 7, 1990, telling Biro to hide the gun because he had just used it to commit murder.

Biro also admitted that he told several people, including Phu, that he had committed the murders. He claimed, nevertheless, that he had only been joking and that the details of the crime which he had provided to Phu had been obtained from Burke Abrams.

Biro was found guilty of the double murder, home invasion, burglary, and intentional homicide of an unborn child. He was sentenced to imprisonment for his natural life and now brings this appeal.

The first issue raised by Biro is whether he was denied a fair trial

by the admission of "evidence of collateral crimes, criminal ideation, and other bad acts." This issue stems from the fact that, at trial, the State produced evidence that Biro broke into New Trier High School on two occasions and stole computer equipment; that Biro told Phu about these burglaries and about a plan to rob a Winnetka bank and kill the employees; that Biro had crime paraphernalia in his bedroom, including a police scanner and tools which could be used for burglary; and that the police found a folder in Biro's bedroom which contained news clippings regarding the Langert murders and other crimes, as well as a handwritten note containing biblical references to Cain and Abel, proclaiming "I kill people."

Biro argues that none of this evidence had any purpose other than to paint him as a person with the propensity to commit crime and, for that reason, it should have been inadmissible. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) Even where Biro concedes that the evidence might be relevant, Biro claims that the evidence was inadmissible because the probative value was outweighed by its prejudicial effect. *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.

The State responds, arguing that all of the contested evidence was properly admitted based upon its probative value, which was not outweighed by its prejudicial effect. If, however, this court should find that the evidence was improperly admitted, the State argues that any error of its admission would be harmless beyond any reasonable doubt.

As a general proposition of law, admission of evidence at trial is a matter left to the sound discretion of the trial court judge, whose decision will not be overturned on review unless a clear abuse of that discretion is apparent. (*People v. Gonzales* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) Evidence of other crimes or bad acts, though unquestionably inadmissible to show a defendant's propensity to commit crime, is admissible for any number of other appropriate purposes. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 584 N.E.2d 89.) A trial court's rulings on the admission of evidence, which hinges on its relevancy and its probative value, should be reviewed in context of the circumstances in which the evidence was offered at trial.

This court has reviewed the entire record to understand the manner in which this case unfolded at trial. Having done so, this court feels compelled to comment on the professional manner in which counsel for both the State and the defendant performed. This trial was a textbook example of the step-by-step process of building an overwhelmingly strong case.

■ With regard to the contested evidence, it is true that much of

it was not relevant to the crimes charged, nor did it add to the State's case. Nevertheless, it is equally clear that the trial court judge, in each instance, made reasoned decisions regarding the admission of the contested evidence. We can find no abuse of the broad discretionary powers with which the judge is endowed. Consequently, we find no error in the admission of evidence of which defendant complains on appeal.

The evidence that Biro stole computer equipment from New Trier High School, as well as the evidence that Biro planned to rob a bank, was brought out by the State during redirect examination of Phu, after the State requested a sidebar and the trial court ruled the evidence admissible. In determining the admissibility of this evidence, the trial court took into consideration the fact that defense counsel, when cross-examining Phu, focused on the fact that the Langert murders occurred on April 7, 1990, that Phu first learned of Biro's involvement in the murders during a conversation with Biro on July 28, 1990, but that Phu did not report this information to the police until October 4, 1990. Focusing on this delay, defense counsel attempted to show that it was a function of Phu's lack of belief in the veracity of the information. Defense counsel also attempted to portray Phu as a naive youngster whom Biro enjoyed teasing and Biro as an inveterate prankster who loved to shock people. As a result of this trial tactic, the State argued it should be allowed to elicit Phu's testimony that Biro told him about the New Trier burglaries and that Phu had subsequently seen the stolen computer equipment in Biro's room. The State argued that this evidence was now relevant to show that Biro had told Phu about the murders, not as a joke, but because he had come to trust Phu because Phu had not betrayed earlier confidences. Furthermore, the State argued that Phu's failure to report Biro's New Trier burglaries showed the extent of his friendship to Biro, which was the real reason for his hesitancy to report Biro to the police. The State also established, by *voir dire*, that the key factor in Phu's decision to report Biro to the police was Biro's stated plan to rob the bank. Phu testified that it was only when he heard of the bank robbery plan that he realized that Biro might kill again.

After considering the circumstances and the rationale offered by the State for the admission of the evidence, the trial court determined that the evidence concerning Phu's knowledge of Biro's New Trier burglaries did have probative value which was not outweighed by its prejudicial effect. The trial court reasoned that the evidence provided some explanation as to why Biro would confess his involvement in the murders to Phu and why Phu would delay in reporting Biro's

admission. The court also stated that it felt that the prejudice was minimal in light of the fact that Biro was being tried for murder. The trial court opined that, when considering Biro's guilt for the crime of murder, it would be unlikely that the jury would be unduly influenced by knowledge that Biro once committed a burglary. The trial court also determined that Phu's testimony regarding Biro's plan to rob the bank was admissible to counterbalance defense counsel's inference that Phu delayed in reporting the information because Phu thought Biro was joking and lacked of faith in Biro's veracity.

There is support for the rulings made by the trial court. In *People v. Rixie* (1989), 190 Ill. App. 3d 818, 829, 546 N.E.2d 52, it was held that evidence of other criminal conduct may become admissible when invited by the defense counsel's trial tactic. In light of the circumstances presented at trial, we find that the trial court did not abuse its discretion in admitting the evidence. It is clear that the trial court considered the probative value, in relation to the prejudicial effect, of all of the evidence. We disagree with defendant's characterization that the evidence had no probative value other than to show propensity to commit crimes. The evidence did tend to establish the trusting relationship that existed between Phu and Biro, which also tended to negate the inference raised by defense counsel that Biro told Phu that he committed the murders only as a joke. Therefore, we do not find that the trial court abused its discretion in admitting this evidence.

We find less rationale for finding admissible the evidence of certain crime paraphernalia and Biro's folder containing news clippings of other crimes and his handwritten notes. Nevertheless, we find that any error in admitting these pieces of evidence was harmless beyond a reasonable doubt in light of the unusually strong case presented against Biro.

■ The next issue deals with the State's cross-examinations of Biro and Biro's father, which were calculated to leave the impression that Biro lacked parental supervision and discipline, even after his parents learned that Biro had illegally obtained a firearm owner identification card (FOID Card). Although the State's questions may have been improper comment on Biro's character and upbringing, it can hardly be said that the comments were relied upon by the State to prove its case against Biro. (See *People v. Kannapes* (1990), 208 Ill. App. 3d 400, 567 N.E.2d 377 (error of admitting evidence not harmless if it was used by the State to prove its case).) Nor does our review of the record reveal the type of egregious behavior on the part of the prosecutor as was condemned in *People v. Starks* (1983), 116 Ill. App.

3d 384, 451 N.E.2d 1298. We believe that any error associated with the State's cross-examination of Biro and his father regarding Biro's supervision was harmless in light of the overwhelming evidence presented by the State against Biro.

Furthermore, the questions were largely unobjected to at trial and not raised as error in the post-trial motion. Therefore, the error may also be deemed waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

In his third issue on appeal, Biro charges the prosecutor with misconduct during closing argument, an almost routine issue on appeal. The State's argument which Biro finds objectionable is the portion of rebuttal argument wherein the prosecutor stated that Biro wanted the jury to believe that Burke Abrams was the killer but that he waited "one year, seven months, and five days" before revealing the name of Burke Abrams.

Biro characterizes this as an improper comment on his post-arrest silence, in violation of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. He claims that the prosecutor impeached his exculpatory account of events told at trial by implying that he never told police this version of events when, in fact, at the time of his arrest he told the police that "a friend" had committed the murders.

The State argues that no *Doyle* violation occurred because the State's argument was not a reference to Biro's post-arrest silence, but rather, a comment on Biro's pre-arrest silence, *i.e.*, the fact that, according to his own testimony, he became aware of the killer's name on the night of the murders, April 7, 1990, but never came forward. The State also argues that the comment could not be a reference to his post-arrest silence because Biro did not remain silent after arrest, although it is conceded that Biro's post-arrest statement was not presented to the jury.

It is undisputed that Biro did not remain silent after he was arrested and given *Miranda* warnings. Biro told police that "a friend" committed the murder, although he did not name this friend until trial. *Doyle* is generally not applicable unless the defendant actually exercised his right to remain silent. (See *People v. Little* (1991), 223 Ill. App. 3d 264, 585 N.E.2d 148.) In this case, however, Biro's post-arrest statement was not introduced at trial. Therefore, the jury was unaware that Biro had made any exculpatory statements after his arrest. Consequently, assuming that *Doyle* applies in this instance, we believe that the situation fits within an exception to the *Doyle* rule.

It has been held that where a defendant provides a statement to police and that version of events omits vital facts later included at

trial, defendant may be impeached with the fact that he omitted those facts without violating the *Doyle* rule. (*Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180; *People v. Ridley* (1990), 199 Ill. App. 3d 487, 557 N.E.2d 378.) This is what occurred in this case and, we believe, the State was within its right to comment on the fact that Biro had withheld the name of the alleged perpetrator until his own testimony at trial.

Additionally, as this court has repeatedly held, the prosecutor must be given wide latitude in his ability to argue before the jury (*People v. Page* (1993), 156 Ill. 2d 258, 620 N.E.2d 339), and even when some of the prosecutor's comments constitute error, reversal of the conviction will not be necessary unless the error constituted a manifest factor in the conviction. In this case, even if the comment by the prosecutor was error (which we do not believe it was), it would have been harmless, since the evidence was not closely balanced (*People v. Garner* (1993), 248 Ill. App. 3d 985, 618 N.E.2d 753) and because the trial court properly instructed the jury that opening and closing argument is not evidence. *People v. Reeves* (1992), 228 Ill. App. 3d 788, 593 N.E.2d 683.

In his fourth charge of error, Biro claims that the State's examination of rebuttal witness Megan O'Callaghan concerning an alleged conversation she had with Biro about the "perfect crime" was improper and denied him a fair trial. Biro now contends that this testimony was objectionable because (1) a proper foundation was not made for it during Biro's cross-examination, (2) Megan's testimony was not inconsistent with and did not impeach Biro's trial testimony, and (3) the testimony was hearsay.

■ We find that these claims were not properly preserved for our review since Biro did not cite the rebuttal testimony of Megan O'Callaghan as error in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Furthermore, had this issue been properly preserved, we would hold that no error occurred since the admission of rebuttal evidence to explain, contradict, or disprove evidence presented by the accused is best left to the sound discretion of the trial judge, whose decision may not be overturned absent a clear showing of an abuse of that discretion. (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 459 N.E.2d 1102.) In this case O'Callaghan admitted, although somewhat reluctantly, that she had had a conversation with Biro during which the "perfect crime" was discussed. Under these circumstances we cannot say that the trial court abused its discretion in allowing her testimony to be admitted in rebuttal. In addition, as already discussed above, the State presented an overwhelming case against Biro and his conviction did not hinge on this evidence. Therefore, any defect in its presentation was harmless.

In his fifth charge of error, Biro contends that his right of confrontation was violated and he was denied a fair trial when the trial court refused to allow him to question Officer Kalvaitis, the officer in charge of the police investigation into the Langert murders, concerning the course and scope of the police investigation. Biro argues that this line of questioning should have been admitted to discredit the testimony of Officer Caldwell, who testified that he had seen Biro one block from the Langert residence at 9 p.m. on the night of the murders, wearing dark clothing and gloves, and had reported this fact to Investigator Benoit, who testified that he made out a "lead card" on this information. It is Biro's theory that by questioning Officer Kalvaitis about the meticulous care with which every possible lead into the murders was followed, he could have cast doubt upon the testimony of Officer Caldwell and Investigator Benoit. On this point, Biro sets forth the settled rule of law, more frequently cited by prosecutors, that the steps of a police investigation are relevant in a criminal case. *People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803.

The State counters this argument with three of its own arguments: (1) that the defense waived this claim by its failure to raise a constitutional objection at trial, also citing *Hayes*, (2) that the evidence was inadmissible hearsay, citing *People v. Janis* (1992), 240 Ill. App. 3d 805, 608 N.E.2d 359, and *People v. White* (1985), 134 Ill. App. 3d 262, 479 N.E.2d 1121, and (3) that if any error did occur, is was harmless because of the overwhelming evidence against Biro and because defense counsel was not precluded from making his argument on the credibility of the officers' testimony despite the omission of this evidence, citing *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.

■ Although the arguments of both parties have some merit, we prefer to hold in this case that the judge's decision to restrict defense counsel's exploration into the breadth and scope of the police investigation fell within the trial court's discretion to control the case and limit direct and cross-examination of witnesses. Unless the trial judge manifestly abuses that discretion, there is no error. (*People v. Henderson* (1991), 223 Ill. App. 3d 131, 583 N.E.2d 1187.) Here it is clear that the fact that the police investigation went far afield before focusing on Biro was collateral to the issue of Biro's involvement. We find no abuse of discretion in the court's decision to limit such testimony. The court record in this case, which is well over 2,000 pages and contains the testimony of some 35 witnesses, reveals that the prosecution and defense attorneys made excellent presentations of their respective cases and that the trial judge was patient and able

in a most difficult case. A review of the entire record reflects that Biro received as fair a trial as our American judicial system can supply.

In his next issue, Biro maintains that the trial court erred when it admitted into evidence photographic exhibit No. 84. This exhibit, which depicted Stephen Langert's bloody face near some toppled metal shelves on the floor of the townhouse basement, was offered into evidence after the State's case in chief, but was excluded by the court upon a finding that its prejudicial effect outweighed any probative value. After the defense presented its closing argument, the trial judge reversed himself and allowed the evidence to be admitted.

During closing argument, defense counsel argued, for the first time, that a piece of the State's evidence, the metal shelving unit which contained some markings in Nancy Langert's blood, was a message from Nancy Langert about her killer. Defense counsel postulated that Nancy knew her killer and that she was forming the letters "BU" (the beginning of the name Burke) when she died.

After this argument the State asked the court, outside the presence of the jury, to reconsider its ruling on exhibit No. 84. The State argued that the photograph, which showed the position of the metal shelving unit in close proximity to Stephen, considered in conjunction with the fact that Nancy's body was found near the bottom of the stairs, supported the State's theory that the bloody markings left on the metal shelving unit by Nancy Langert were "I U," a message that she completed to her husband and then attempted to reach the stairs, where she expired.

The trial court granted the State's request and ruled exhibit No. 84 admissible. The trial court offered defense counsel an opportunity to reopen its argument for 10 minutes based on this ruling, but counsel declined the offer. Upon the jury's return to the courtroom, the trial judge informed them the reason for the delay was that exhibit No. 84, which had previously been excluded, had now been admitted, that "the defense had an opportunity to reopen its argument" and that "the State will have an opportunity to argue from that."

Biro now claims that he was highly prejudiced, not only by the changed ruling, but by the court's commentary to the jury on this matter, which may have given the impression that the defense had no answer to the State's newly admitted evidence.

■ First of all, a trial court may, in the exercise of its discretion, reopen a case for further evidence after closing argument. (*People v. Ford* (1985), 139 Ill. App. 3d 894, 488 N.E.2d 573; *People v. Padfield*

(1974), 16 Ill. App. 3d 1011, 307 N.E.2d 183.) Here, we find no error in the court's decision to reopen the case to admit photographic exhibit No. 84. It was defense counsel's argument that raised, for the first time, the question of the meaning of the bloody markings found on the shelving unit. The position of the shelving unit in relation to the Langerts' bodies became relevant based upon the defendant's closing argument and it was proper for the State to have requested the revised ruling on the admission of the photograph, which was made relevant by the newly advanced defense theory.

Furthermore, although we agree that a trial judge must be circumspect in its comments to the jury and ever careful not to show favoritism or bias, we do not believe that the situation here constituted judicial error. Although Biro interprets the court's comments in a manner consistent with his theory that he was unfairly prejudiced, we believe the judge's explanation for the delay to the jury was benign commentary or, at the worst, ambiguous.

Furthermore, this court has recently held that a judge's statement, which was arguably much more prejudicial than the one here, did not constitute reversible error because the defendant could not show that he was harmed by the remark or that the remark constituted a material factor in the conviction. (See *People v. Thompson* (1991), 234 Ill. App. 3d 770, 601 N.E.2d 765.) Such was the case here, where the evidence of Biro's guilt was more than sufficient.

Biro's seventh and final issue concerns his sentence. On December 20, 1991, Biro was sentenced to natural life imprisonment, with no parole, for each of the two convictions for murder. The court held that the convictions for home invasion, burglary and intentional homicide of an unborn child merged with the two convictions for murder and did not sentence Biro on these convictions. Biro now contends that his sentence of natural life imprisonment, without possibility of parole, is unconstitutional given the fact that he was only 16 years old at the time the murders occurred and because he was tried as an adult without the benefit of a transfer hearing in juvenile court. Although Biro concedes that mandatory life sentences, even when applied to minors, have withstood constitutional challenge, he contends that a different result should prevail in this case. We disagree.

The cases *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675, and *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147, are dispositive of the issue. In all of these cases mandatory life sentences were upheld despite the youth of the defendant.

However, the State raises an issue with respect to the sentence,

which we feel must be addressed. The trial court judge refused to impose sentence upon Biro for his conviction for intentional homicide of an unborn child, despite admonishments from the State that the imposition of a separate sentence would be appropriate. The court expressed doubt on the question of whether the conviction for intentional homicide of an unborn child, under the attendant circumstances, would merge. Nevertheless, the court imposed no sentence on the conviction and advised the State to raise the issue on appeal.

■ The State has raised the issue on appeal and has cited *People v. Campos* (1992), 227 Ill. App. 3d 434, 592 N.E.2d 85, and *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183, in support of its argument that a separate sentence should have been imposed for the conviction for intentional homicide of an unborn child. During oral argument in this court, defense counsel conceded that feticide is not a lesser included charge of murder and that the trial court erred in merging the conviction for intentional homicide of an unborn child with the murders. Consequently, we remand this case back to the trial court for further sentencing on that conviction.

The convictions and sentence entered in this case by the circuit court of Cook County are hereby affirmed. The case is remanded to the trial court for the sole purpose of entering sentence on the conviction for intentional homicide of an unborn child.

Affirmed and remanded.

GORDON and McNULTY, JJ., concur.